STATE OF MINNESOTA, by its Commissioner of Public Welfare, Arthur E. NOOT, Petitioner,

v.

Margaret M. HECKLER, Secretary, and the United States Department of Health and Human Services, Respondents.

STATE OF MINNESOTA, by its Commissioner of Public Welfare, Arthur E. NOOT, Appellee,

v.

Margaret M. HECKLER, in her official capacity as Secretary of the United States Department of Health and Human Services, Appellant.

Nos. 82–1164, 82–2297.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 8, 1982.

Decided Sept. 30, 1983.

Warren Spannaus, Atty. Gen., State of Minn., Alan T. Held, Sp. Asst. Atty. Gen., St. Paul, Minn., for petitioner.

Susanne M. Lee, Dept. of Health and Human Services, Washington, D.C., for respondents; Juan A. del Real, Gen. Counsel, Ann T. Hunsaker, Asst. Gen., Sarah W. Wilcox, Dept. of Health and Human Services, of counsel.

Charles A. Miller, J. Peter Byrne, Covington & Burling, Washington, D.C., for the States of Ala., Conn., Md., Mich., Mo., N.Y., Okl., R.I., W.Va., Wis., amici curiae.

Hubert H. Humphrey, III, Atty. Gen., State of Minn., Alan T. Held, Sp. Asst. Atty. Gen., St. Paul, Minn., for State of Minn.

Before LAY, Chief Judge, ROSS and FAGG, Circuit Judges.

LAY, Chief Judge.

These cases were consolidated for purposes of resolving issues of subject matter jurisdiction and conflicting interpretations of Title XIX of the Social Security Act, 42 U.S.C. § 1396 et seq. (1976 & Supp. V 1981). The State of Minnesota contests a decision of the Secretary of the United States Department of Health and Human Services (HHS) disallowing federal financial partici-

pation to the State under the Medical Assistance Program (Medicaid) for costs incurred in three community residential facilities. The facilities were determined by the Secretary to be "institutions for mental diseases" (IMDs) and thus were not qualified for partial federal reimbursement of medical costs for individuals eligible for Medicaid.

Beginning in 1973, the State of Minnesota paid Medicaid claims for individuals receiving services in the Andrew Care Home, the Birchwood Care Home, and the Hoikka House. The three community residential care homes had been certified as "intermediate care facilities" (ICFs).[1] "Intermediate care facility services" for eligible individuals under 65 are reimbursable under the Act other than such services provided in an institution for tuberculosis or an "institution for mental diseases." *See* 42 U.S.C. § 1396d(a)(15), (18)(B) (1976). The residents of these three homes included a majority of individuals with mental illness diagnoses. During the quarters ending September 30, 1977 through June 30, 1978, Minnesota claimed and was paid $896,159 in federal financial participation for services provided to the Medicaid recipients at these three facilities. In November 1978 the HHS Health Care Financing Administration (HCFA) submitted an audit report which recommended disallowance of the

$896,159 claim on the ground that these facilities were IMDs. The agency employed unpublished interpretive guidelines to determine if the "overall character" of the facilities fit the regulatory definition of an IMD as being "primarily engaged in providing diagnosis, treatment or care of persons with mental diseases." *See* 42 C.F.R. § 435.1009(e) (1982); *see also id.* § 440.-140(a)(2) (1982). As a result, the Secretary disallowed the State's claim. The State petitioned the HHS Departmental Grant Appeals Board for a review of the decision. Consolidating the petition with requests by the States of Connecticut, California, and Illinois to review similar disallowances, the Board upheld the agency decision. Departmental Grant App.Bd. Nos. 79–52–MN–HC, 79–89–MN–HC, 80–44–IL–HC, 80–150–CT–HC, 80–184–CA–HC (Nov. 30, 1981). HHS recovered the full amount of these funds paid to Minnesota by offsetting federal financial participation in a supplemental grant to the State.

Minnesota filed a petition for direct review of the final agency order with this court; such action was taken to protect the right of review in the event the dispute was determined to be a plan conformity matter under 42 U.S.C. § 1316(a)(3) (1976 & Supp. V 1981),[2] and not a disallowance under 42 U.S.C. § 1316(d) (1976 & Supp. V 1981).[3]

---

1. In 1982 over 600 Minnesota facilities were certified as "intermediate care facilities."

2. 42 U.S.C. § 1316(a)(3) (1976 & Supp. V 1981) reads in relevant part:

   Any State which is dissatisfied with . . . a final determination of the Secretary under section . . . 1396c of this title may, within 60 days after it has been notified of such determination, file with the United States court of appeals for the circuit in which such State is located a petition for review of such determination.

   For operation of state plans, 42 U.S.C. § 1396c (1976) states:

   If the Secretary, after reasonable notice and opportunity for hearing to the State agency administering or supervising the administration of the State plan approved under this subchapter, finds—

   (1) that the plan has been so changed that it no longer complies with the provisions of section 1396a of this title; or

   (2) that in the administration of the plan there is a failure to comply substantially with any such provision;

   the Secretary shall notify such State agency that further payments will not be made to the State (or, in his discretion, that payments will be limited to categories under or parts of the State plan not affected by such failure), until the Secretary is satisfied that there will no longer be any such failure to comply. Until he is so satisfied he shall make no further payments to such State (or shall limit payments to categories under or parts of the State plan not affected by such failure).

3. 42 U.S.C. § 1316(d) (1976 & Supp. V 1981) reads as follows:

   (d) Whenever the Secretary determines that any item or class of items on account of which Federal financial participation is claimed under title . . . XIX . . ., shall be disallowed for such participation, the State shall be entitled to and upon request shall receive a reconsideration of the disallowance.

The State also sought review of the Board's decision in the United States District Court for the District of Minnesota by filing an action for declaratory and injunctive relief as well as restoration of its grant money withheld by HHS.

The district court granted summary judgment in favor of the State of Minnesota, holding that HHS acted arbitrarily, capriciously, and outside the scope of its authority; it ordered HHS to return to the State the disallowed funds. *Minnesota v. Schweiker*, No. 4–82–155, slip op. at 14 (D.Minn. Aug. 25, 1982). HHS now appeals this decision. The two cases were consolidated to resolve the jurisdictional issues and the merits.

## I. *Plan Conformity or Disallowance.*

A fundamental question is whether this dispute involves a noncompliance question or a disallowance. Both the Secretary and the State urge that the matter involves a disallowance and therefore this court has no jurisdiction to directly review the Board's decision. We agree.

Recent decisions from other circuits have taken divergent approaches to assessing the nature of Medicaid controversies. The First Circuit employs a functional analysis which examines three criteria: (1) whether the matter could comfortably fit within the plan conformity language of 42 U.S.C. § 1396c (1976); (b) whether the broad nature of the dispute points to characterization as a conformity issue; and (3) what procedures and label the Secretary has chosen, "not as definitive but as entitled to some respect." *See Massachusetts v. Departmental Grant Appeals Board*, 698 F.2d 22, 27–30 (1st Cir.1983). *Cf. New Jersey v. Department of Health and Human Services*, 670 F.2d 1262, 1272 (3d Cir.1981) (*New Jer-*

*sey I*) (court must independently evaluate underlying substance of dispute so that court of appeals' jurisdiction is not contingent upon Secretary's unfettered discretion); *State Department of Public Welfare v. Califano*, 556 F.2d 326, 330 (5th Cir.1977), *cert. denied*, 439 U.S. 818, 99 S.Ct. 78, 58 L.Ed.2d 108 (1978) (court should review Social Security Act, legislative history, and circumstances of claim to see what label best serves purposes of the act and the equities of the situation).

In contrast, the Seventh Circuit found the functional approach "complicated and therefore uncertain in application—a serious weakness in a jurisdictional test." *Illinois v. Schweiker*, 707 F.2d 273, 278 (7th Cir.1983). Instead, it adopted a literal test which allows HHS' choice of the plan conformity or disallowance label and procedures to control.[4] *Id. Cf. Connecticut v. Schweiker*, No. 82–4023 (2d Cir. April 20, 1982) (without explanation, court of appeals dismissed for lack of jurisdiction a petition for direct review of alleged plan conformity issue; Secretary had denominated the dispute as a disallowance); *Department of Public Health v. Departmental Grant Appeals Board*, 672 F.2d 916 (6th Cir.1981) (same); *Washington Department of Social and Health Services v. Schweiker*, No. 81–7414 (9th Cir. Sept. 30, 1981) (same).[5]

Although some deference is to be accorded the Secretary's opinion on these jurisdictional fact issues, we find the functional test in *Massachusetts v. Departmental Grant Appeals Board*, 698 F.2d at 27–30, is more in accord with the traditional role of federal judicial review which mandates judicial inquiry as to congressional intent, jurisdiction, and the legality of federal administrative actions. *Accord New Jersey I*, 670 F.2d at 1272.

---

**4.** The Seventh Circuit panel did interject a caveat to its "clean line" approach, noting that some "safety valve" may be necessary to prevent HHS from evading the scheme of judicial review created by Congress when the practical effect of a disallowance is to shut off all or most of a state's federal financial participation. *Illinois v. Schweiker*, 707 F.2d at 279.

**5.** In *Illinois v. Schweiker*, the court stated that it prefers "the simpler approach *apparently followed by the Sixth and Ninth Circuits*" in these cited cases (emphasis added). The court acknowledged that "the Third Circuit has questioned the meaning of these cryptic unpublished orders." *Illinois v. Schweiker*, 707 F.2d at 279. *See also New Jersey I*, 670 F.2d at 1273 n. 10.

■ The underlying nature of this controversy stems from the discrete reason that three nursing homes were decertified and thus did not qualify for federal funding. In this regard, the district court correctly observed "[t]his dispute does not concern the validity of Minnesota's Medicaid plan or its overall administration." *Minnesota v. Schweiker,* slip op. at 4–5. Plan conformity issues under the statute, sections 1316(a)(3) and 1396c, generally relate to compliance questions that have a broad impact on the overall state program. We cannot say, under the plan conformity specifications of section 1396c(2), that the State in the administration of its Medicaid plan failed to comply substantially with the provisions of 42 U.S.C. § 1396a (1976 & Supp. V 1981). The decertification here is basically rooted in a failure to comply with an agency interpretive guideline.[6] In addition, the claim arises out of the disallowance procedures involving a specific audit, and only a retroactive, not prospective, sanction was imposed.[7] We thus conclude that the dispute clearly relates to a disallowance rather than a conformity issue. *Accord Connecticut v. Schweiker,* No. 82–4023 (2d Cir. Apr. 20, 1983); *Connecticut v. Schweiker,* 557 F.Supp. 1077, 1079 & n. 5 (D.Conn. 1983).

## II. *Jurisdiction of District Court.*

Although section 1316(a)(3) grants a state dissatisfied with a plan conformity decision the right to direct review in a court of appeals, the provision for disallowances, section 1316(d), is silent as to the availability of judicial review for such disputes.[8]

■ We agree with the courts that have found that disallowance decisions under section 1316(d) are judicially reviewable. *Illinois v. Schweiker,* 707 F.2d at 275–277; *Alameda v. Weinberger,* 520 F.2d 344, 347–48 (9th Cir.1975); *Colorado Department of Social Services v. Department of Health and Human Services,* 558 F.Supp. 337, 347–48 (D.Colo.1983); *Connecticut v. Schweiker,* 557 F.Supp. at 1079. Cf. *Solomon v. Califano,* 464 F.Supp. 1203 (D.Md.1979) (court reviewed disallowance decision without discussing jurisdiction); *Georgia v. Califano,* 446 F.Supp. 404 (N.D.Ga.1977) (same). *Contra State Department of Public Welfare v. Califano,* 556 F.2d 326, 329 n. 4, 332 (5th Cir.1977), *cert. denied,* 439 U.S. 818, 99 S.Ct. 78, 58 L.Ed.2d 108 (1978) (dictum).

■ Although the district court has jurisdiction to review this disallowance, the court's power is limited to granting prospectively-oriented declaratory relief. We must vacate the district court's money award restoring past disallowance funds since jurisdiction for this claim is exclusively in the United States Claims Court.[9]

■ The exclusive jurisdiction of the Claims Court applies to monetary claims in excess of $10,000 against the United States and its agencies. 28 U.S.C. § 1491 (1976 &

---

**6.** It is unclear under 42 U.S.C. § 1396c(1), (2) (1976) whether a plan conformity issue can pertain not only to a state's substantial failure to comply with a federal statutory plan requirement, 42 U.S.C. § 1396a (1976 & Supp. V 1981), but also to a state's substantial failure to comply merely with a federal regulation or the state's own plan. *Massachusetts v. Departmental Grant Appeals Board,* 698 F.2d at 28–29 & nn. 5 & 7. HHS has specified that a plan conformity issue may arise from the failure of a state in practice to comply with "a Federal requirement." 45 C.F.R. § 201.6(a) (1982). *Compare Department of Public Health v. Departmental Grant Appeals Board,* 711 F.2d 1056 slip op. at 2 (6th Cir.1983) (disallowance, not conformity issue, found; state in "non-compliance with regulatory rather than statutory requirements") *with New Jersey I,* 670 F.2d at 1266–77 (plan conformity issue found although noncompliance was only with a federal requirement in a "program instruction"); *and Solomon v. Califano,* 464 F.Supp. 1203, 1206–08 (D.Md.1979) (plan conformity found although noncompliance was only with state's plan).

**7.** Administrative procedures governing federal audit agency issues are set forth in 45 C.F.R. § 201.10–.66 (1982).

**8.** HHS does not contest the district court's jurisdiction to review a disallowance decision. It has previously taken an opposite position. *See Alameda v. Weinberger,* 520 F.2d at 347–48.

**9.** We raised the issue sua sponte whether exclusive jurisdiction over both monetary and nonmonetary claims lay in the United States Claims Court.

Supp. V 1981).[10] Since 1972, the Claims Court also can grant limited equitable relief collateral to a monetary award in order to resolve an entire controversy. *See id.; Polos v. United States,* 556 F.2d 903, 906 (8th Cir.1977); *Melvin v. Laird,* 365 F.Supp. 511, 516–20 (E.D.N.Y.1973).

■ If the declaratory or injunctive relief a claimant seeks has significant prospective effect or considerable value apart from merely determining monetary liability of the government, the equitable relief sought is paramount and the district court may assume jurisdiction over the nonmonetary claims.[11] *See Giordano v. Roudebush,* 617 F.2d 511, 514–15 (8th Cir.1980); *Megapulse, Inc. v. Lewis,* 672 F.2d 959, 971 (D.C. Cir.1982); *Rowe v. United States,* 633 F.2d 799, 801–02 (9th Cir.1980), *cert. denied,* 451 U.S. 970, 101 S.Ct. 2047, 68 L.Ed.2d 349 (1981); *cf. Sellers v. Brown,* 633 F.2d 106, 108 (8th Cir.1980). The fact that a suit for nonmonetary relief in the district court may also provide a basis for a grant of money

damages against the United States is not a sufficient reason to foreclose district court jurisdiction. *See Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 71 n. 15, 98 S.Ct. 2620, 2629 n. 15, 57 L.Ed.2d 595 (1978); *Laguna Hermosa Corp. v. B.E. Martin,* 643 F.2d 1376, 1379 (9th Cir.1981); *Melvin v. Laird,* 365 F.Supp. at 520; *see also Beller v. Middendorf,* 632 F.2d 788, 799 (9th Cir.1980), *cert. denied,* 452 U.S. 905, 101 S.Ct. 3030, 69 L.Ed.2d 405 (1981). However, the power of the district court in these types of cases is limited; sovereign immunity of the United States is waived in the district court under 5 U.S.C. § 702 (1982) only for claims against a federal agency or its officers seeking relief "other than money damages." *See United States v. Mitchell,* —— U.S. ——, —— & n. 32, 103 S.Ct. 2961, 2973 & n. 32, 77 L.Ed.2d 580 (1983); *Jaffee v. United States,* 592 F.2d 712, 718–19 (3d Cir.1979). *See generally* K. Davis, *Administrative Law Treatise* § 27.00–.10 (Supp.1980 & 1982).

**10.** 28 U.S.C. § 1491 (1976 & Supp. V 1981) states in relevant part:

The Court of Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.... To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records, and such orders may be issued to any appropriate official of the United States. In any case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just.

*Cf.* 28 U.S.C. § 1346(a)(2) (1976 & Supp. V 1981) (district court has concurrent jurisdiction to grant monetary relief on claims under $10,-000).

**11.** A split of authority exists on the issue whether the district court can assume jurisdiction over equitable claims based on the same facts as monetary claims when the Claims Court also has the power to grant the nonmo-

netary relief. Some courts, including this circuit, have found the equitable jurisdiction of the district court concurrent with the Claims Court when the nonmonetary relief is deemed "primary." *See, e.g., Giordano v. Roudebush,* 617 F.2d 511, 515 (8th Cir.1980); *Stanley v. Commissioners,* 505 F.Supp. 63, 65 (W.D.Mo. 1980); *Bruzzone v. Hampton,* 433 F.Supp. 92, 95–96 (S.D.N.Y.1977); *Melvin v. Laird,* 365 F.Supp. at 518. *But cf. Keller v. Merit Systems Protection Board,* 679 F.2d 220, 223 (11th Cir. 1982) (distinguished *Giordano* because monetary claim was less than $10,000 at time complaint was filed and thus was within district court's statutory jurisdiction). This approach is supported by legislative history indicating that the grant of collateral equitable jurisdiction to the Claims Court in 1972 was intended only to provide an alternative option for litigants to obtain complete relief in one court if they so desired, and was not intended to oust the district court's declaratory judgment and mandamus jurisdiction. *See Melvin v. Laird,* 365 F.Supp. at 516–19.

Other courts adhere to the view that the nonmonetary jurisdiction of the Claims Court is exclusive, and that the district court may not exercise concurrent equitable jurisdiction regardless of whether the equitable relief sought may be categorized as "primary." *See, e.g., Keller v. Merit Systems Protection Board,* 679 F.2d at 222–23; *Denton v. Schlesinger,* 605 F.2d 484, 486–88 (9th Cir.1979); *Shaw v. Pierce,* 534 F.Supp. 735, 738–39 (E.D.Cal.1982).

This jurisdictional limitation results in a bifurcation of claims between the district court and the Claims Court, because the district court is unable to grant monetary relief on claims over $10,000. *See Giordano v. Roudebush,* 617 F.2d at 514–15; *Laguna Hermosa Corp. v. B.E. Martin,* 643 F.2d at 1379 (9th Cir.1981); *Rowe v. United States,* 633 F.2d at 801–02; *Beller v. Middendorf,* 632 F.2d at 799; *Melvin v. Laird,* 365 F.Supp. at 518–19. *But cf. Woodland Nursing Home Corp. v. Califano,* 487 F.Supp. 9, 11–13 (S.D.N.Y.1979) (district court with jurisdiction over nonmonetary claim can exercise pendent jurisdiction over monetary claim to provide a " 'common sense solution' " for complete relief in one court). Such bifurcation is unavoidable when the Claims Court lacks the power to grant the type of declaratory or injunctive relief sought. *See Rowe v. United States,* 633 F.2d at 801–02; *Shaw v. Pierce,* 534 F.Supp. at 738. *Contra Woodland Nursing Home Corp. v. Califano,* 487 F.Supp. at 11–13.

Under the facts involved in this dispute, the disallowance is rooted in the federal agency's guidelines interpreting the meaning of the statutory phrase "institution for mental diseases." The guidelines have an effect upon current and future federal benefits to the State in addition to past federal financial participation. The State estimates that potentially over $10 million in federal funds to the State of Minnesota are at stake here, representing not only past claims collected but other claims foregone when Minnesota stopped submitting further claims after the disallowances in 1978 to avoid risking additional losses. The potential current and future claims foregone dwarf the amount of the disallowance the State seeks to have overturned. Although the Claims Court possesses the jurisdiction necessary to make a legal ruling upon which to base the award of a money judgment, *see Pauley Petroleum Inc. v. United States,* 591 F.2d 1308, 1315, 219 Ct.Cl. 24, 32 (Ct.Cl.), *cert. denied,* 444 U.S. 898, 100 S.Ct. 206, 62 L.Ed.2d 133 (1979), the declaratory relief sought here has conspicuous impact beyond establishing a right to the disallowed funds.[12] The prospective, independent significance of the declaratory relief requested makes it, not the compensatory money payments, the primary relief sought by the State of Minnesota.[13] Therefore the

12. The other relief requested by the State of Minnesota for an order to restore the disallowed funds and for a permanent injunction barring future recovery of that money only relates to the monetary compensation desired by the State for the disallowance. Claims essentially seeking monetary relief over $10,000 fall within the Claims Court's exclusive jurisdiction which may not be evaded by framing a claim for injunctive relief or by requesting the exercise of mandamus jurisdiction. *See Portsmouth Redevelopment and Housing Authority v. Pierce,* 706 F.2d 471, 474 (4th Cir.1983); *Polos v. United States,* 556 F.2d 903, 905 n. 5 (8th Cir.1977); *Wingate v. Harris,* 501 F.Supp. 58, 61–62 (S.D.N.Y.1980) (Medicaid disallowance); *State Department of Public Welfare v. Califano,* 388 F.Supp. 1304, 1308 (W.D.Tex. 1975) (state Medicaid claim), *modified in part on other grounds,* 556 F.2d 326, 332 (5th Cir. 1977), *cert. denied,* 439 U.S. 818, 99 S.Ct. 78, 58 L.Ed.2d 108 (1978). *But see Minnesota v. Weinberger,* 359 F.Supp. 789, 791–92 (D.Minn. 1973) (mandamus power authorized order of payment by federal agency to state for claim under Social Security Act).

Furthermore, an injunction is inappropriate when the injury can be redressed fully by an award of damages. *E.g., Wingate v. Harris,* 501 F.Supp. at 62. Likewise, the exercise of mandamus power is not properly invoked when another adequate remedy is available. *Id.; State Department of Public Welfare v. Califano,* 388 F.Supp. at 1308.

This case is unlike the situation in *State Highway Commission v. Volpe,* 479 F.2d 1099, 1104, 1123 (8th Cir.1973), where injunctive relief to cease unauthorized action would automatically make benefits available. In contrast, affirmative action barred by the doctrine of sovereign immunity would be required to produce essentially compensatory payments to the State of Minnesota. *See Johnson v. Mathews,* 539 F.2d 1111, 1124 n. 21 (8th Cir.1976).

13. In contrast, a dispute over a Medicaid disallowance in *Wingate v. Harris,* 501 F.Supp. 58, 60–62 (S.D.N.Y.1980), principally involved monetary relief and thus fell within the exclusive jurisdiction of the Claims Court. The district court categorized the requested declaratory and injunctive relief as ancillary under the facts involved, reasoning:

While it is true that plaintiffs seek several "declarations" regarding the invalidity of various HEW regulations and the illegality of the Secretary's actions thereunder, this relief is merely incidental to the primary remedy

district court had jurisdiction over the non-monetary claims under 28 U.S.C. § 1331 (1976 & Supp. V 1981) and 28 U.S.C. § 2201 (1976 & Supp. V 1981).[14]

### III. The Merits.

■ In deciding that the three facilities in question were "institutions for mental diseases" (IMD) under agency interpretive guidelines, the HHS' Departmental Grant Appeals Board reached conclusions of both fact and law. The agency's formal findings of fact will be upheld if supported by substantial evidence in the record considered as a whole. *See Citizens To Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 414–15, 91 S.Ct. 814, 822–23, 28 L.Ed.2d 136 (1971); *Volkswagenwerk Aktiengesellschaft v. Federal Maritime Commission,* 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968); *Consolo v. Federal Maritime Commission,* 383 U.S. 607, 619–21 & n. 19, 86 S.Ct. 1018, 1026–27 & n. 19, 16 L.Ed.2d 131 (1966); 5 U.S.C. § 706(2)(E) (1982); *see generally* K. Davis, *supra,* §§ 29.01–.11 (1958 & Supp.1980 & 1982).

■ In contrast, the agency's guidelines interpreting a statutory term and a regulation ultimately involve questions of law which are to be resolved by the court. *See*

*Batterton v. Francis,* 432 U.S. 416, 424–26 & n. 9, 97 S.Ct. 2399, 2404–06 & n. 9, 53 L.Ed.2d 448 (1977); *Social Security Board v. Nierotko,* 327 U.S. 358, 368–69, 66 S.Ct. 637, 642–43, 90 L.Ed. 718 (1946); *White Industries, Inc. v. Federal Aviation Administration,* 692 F.2d 532, 534 (8th Cir.1982); 5 U.S.C. § 706 (1982). "Ordinarily, administrative interpretations of statutory terms are given important but not controlling significance."[15] *Batterton v. Francis,* 432 U.S. at 424, 97 S.Ct. at 2404; *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944). *Research Medical Center v. Schweiker,* 684 F.2d 599, 602 (8th Cir.1982); *see generally* K. Davis, *supra,* § 30.13.

■ As in all cases focusing on statutory construction, we must initially look to the language chosen by Congress. *American Tobacco Co. v. Patterson,* 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982); *Bread Political Action Committee v. Federal Election Committee,* 455 U.S. 577, 580, 102 S.Ct. 1235, 1237, 71 L.Ed.2d 432 (1982). The ordinary meaning of the words used are presumed to express congressional purpose; thus, absent clearly expressed legislative intention to the contrary, the language is regarded as conclusive. *American*

---

requested: an order directing payment of the monies withheld by the Secretary. The declaratory relief sought simply establishes plaintiffs' legal entitlement to this principal remedy, and does not expand it in any meaningful way.... *Nowhere ... is it alleged that this regulation is in current use to deprive plaintiffs of any benefit.* Rather, the gist of their claim is that its *application in the past* with respect to the three nursing homes discussed above operated to deprive them of federal funds to which the Act entitled them. This claimed injury can be redressed fully by an award of damages ....
*Id.* at 62 (emphasis added).

**14.** It is apparent that cooperation from HHS would obviate the need for the state to bring a separate suit in the Claims Court to obtain monetary relief for the funds disallowed here. *Cf. Connecticut v. Schweiker,* 557 F.Supp. at 1091 ("This court trusts that HHS ... will promptly restore any setoff already taken. An injunction is therefore unnecessary.").

**15.** The unpublished interpretive guidelines in question here do not reflect an exercise of ex-

pressly delegated congressional authority to prescribe substantive standards for determining the meaning of the statutory phrase "institution for mental diseases." *Compare General Electric Co. v. Gilbert,* 429 U.S. 125, 141–45, 97 S.Ct. 401, 410–12, 50 L.Ed.2d 343 (1976); *Morton v. Ruiz,* 415 U.S. 199, 236–37, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270 (1974); *Social Security Board v. Nierotko,* 327 U.S. at 369, 66 S.Ct. at 643 ("Except as such interpretive power may be included in the agencies' administrative functions," Congress did not delegate to the Social Security Board power to define the statutory term.) *with Herweg v. Ray,* 455 U.S. 265, 274, 102 S.Ct. 1059, 1065, 71 L.Ed.2d 137 (1982) (When a term in the statute is followed by a phrase such as "as determined in accordance with standards prescribed by the Secretary," definitional regulations are to be given legislative effect.); *Schweiker v. Gray Panthers,* 453 U.S. 34, 37, 43–44, 101 S.Ct. 2633, 2639–40, 69 L.Ed.2d 460 (1981) (same); *Batterton v. Francis,* 432 U.S. at 424–26 & n. 9, 97 S.Ct. at 2404–06 & n. 9 (1977) (same).

*Tobacco Co. v. Patterson,* 455 U.S. at 68, 102 S.Ct. at 1537.

The Medicaid statute defines federal "medical assistance" for needy individuals to include, among other items, "intermediate care facility services (*other than such services in an institution for* tuberculosis or *mental diseases*) for individuals who are determined . . . to be in need of such care." 42 U.S.C. § 1396d(a)(15) (1976) (emphasis added). The identical exclusion for services in an IMD is repeated in sections granting medical assistance for "inpatient hospital services" and "skilled nursing facility [SNF] services." *Id.* § 1396d(a)(1), (4)(A). A correlating section, however, allows payments for "inpatient hospital services, skilled nursing facility services, and intermediate care facility services for individuals 65 years of age or over, in an institution for tuberculosis or *mental diseases.*" *Id.* § 1396d(a)(14) (emphasis added). Additionally, the statute provides for funds for "inpatient psychiatric hospital services for individuals under age 21." 42 U.S.C. § 1396d(a)(16) (1976 & Supp. V 1981). The statutory definition of "medical assistance" clarifies the prohibition against payments for individuals between age 21 and 65 in an IMD: "[E]xcept as otherwise provided in paragraph (16) [inpatient psychiatric services for individuals under age 21], such term ["medical assistance"] does not include . . . any such payments with respect to care or services for any individual who has not attained 65 years of age and who is a patient *in an institution for* tuberculosis or *mental diseases.*" *Id.* § 1396d(a)(18)(B) (emphasis added).

Of significance here is the statutory definition of an ICF:

[T]he term "intermediate care facility" means an institution which (1) is licensed under State law to provide, on a regular basis, *health-related care and services to* individuals who do not require the degree of care and treatment which a hospital or skilled nursing facility is designed to provide, but who because of their mental or physical condition require care and services (above the level of room and board) which can be made available to them only through institutional facilities. . . . The term "intermediate care facility" also includes any skilled nursing facility or hospital which meets the requirements of the [preceding] sentence. . . . With respect to services furnished to individuals under age 65, the term "intermediate care facility" shall not include, except as provided in subsection (d) of this section,[16] any *public institution* or distinct part thereof *for mental diseases or mental defects.*

*Id.* § 1396d(c) (emphasis added).

Conspicuously omitted from section 1396d is any statutory characterization of an "institution for mental diseases." The Secretary, however, has promulgated a regulation defining an IMD:

"Institution for mental diseases" means an institution that is *primarily engaged in providing diagnosis, treatment or care of persons with mental diseases,* including medical attention, nursing care and related services. Whether an institution is an institution for mental diseases is determined by its *overall character* as that of a facility established and maintained primarily for the care and treatment of individuals with mental diseases, whether or not it is licensed as such.

42 C.F.R. § 435.1009e (1982) (emphasis added). *See also id.* § 440.140(a)(2).

The consistency of this regulation with the statute is not contested here.[17] What is attacked is the agency's finding that the three facilities in question are IMDs based on HHS' interpretation of this regulation. Certain unpublished agency guidelines were employed to determine the overall character

---

**16.** The reference to "subsection (d)" allows medical assistance for ICF services in a "public institution (or distinct part thereof) for the mentally retarded . . . receiving active treatment." 42 U.S.C. § 1396d(d) (1976).

**17.** *See* 42 U.S.C. § 1302 (1976 & Supp. V 1981) (providing that the Secretary "shall make and publish such rules and regulations, not inconsistent with this Chapter, as may be necessary to the efficient administration of the functions with which . . . [she] is charged under this Chapter").

of these facilities as IMDs. The operating guidelines were developed in response to perceived problems of deinstitutionalization whereby some patients between 21 and 65 years old in state mental hospitals, for which federal Medicaid payments were not obtainable, were relocated by the states in community-based residential facilities, such as ICFs, for which federal funds were available. HHS circulated intra-office instructional bulletins to assist federal field office personnel in their determinations as to the "overall character" of a facility. The following criteria identifying IMDs were used:

1. A facility is licensed as a mental institution;
2. It advertises as a mental institution;
3. More than 50 percent of the patients have a disability in mental functioning [as defined in the *International Classification of Diseases*];
4. It concentrates on managing patients with behavior or functional disorders and is used largely by mental hospitals for alternative care;
5. It is under the jurisdiction of the mental health authority;
6. It is frequently or predominantly used for individuals who are either discharged from mental hospitals or would otherwise be admitted to them;
7. The facility is in proximity to a State Mental Institution (for example, within a 25-mile radius);
8. The age distribution is uncharacteristic of nursing home patients; and
9. The basis of Medicaid eligibility for patients under 65 is a mental disability.

Letter from Tera S. Younger, HCFA Long Term Care Policy Group, to B.F. Simmons (Nov. 3, 1980) (with Discussion Paper: *Redefinition on Institution for Mental Diseases* attached). *See* HHS Field Staff Information and Instruction Series (FSIIS) FY–76–156 (Sept. 14, 1976); FY–76–97 (May 3, 1976); FY–76–44 (Nov. 7, 1975).

The State of Minnesota asserts that these criteria interpreting the IMD regulation conflicts with the Medicaid provisions of the Social Security Act and with agency regulations. The State contends that if a definition consistent with the statute had been applied, the three facilities would not have been classified as IMDs. It urges that Congress intended the phrase "institution for mental diseases" to apply only to state mental hospitals, or alternatively, that the term applies only to institutions whose primary purpose is to provide specialized care or services for mental illness. Thus, the State contends, inquiry into whether a facility is an IMD must focus on the nature of services that the facility renders, not on the diagnosis or type of illness manifested by the patient. It stresses, for example, that the use of the "51% rule" based on the number of patients in a home with diagnoses of mental diseases is a particularly inappropriate and arbitrary factor under the statute.

The agency defends its position by pointing to the statutory section 1396d(a) which lists hospital services separately from SNF and ICF services, and then excludes from payment all three types of services in an IMD. Thus, it says, all IMDs are not traditional mental hospitals. Under its view, the term IMD must be able to include SNFs and ICFs or else the word "hospital" would be superfluous because of being incorporated into the term IMD. HHS argues that the Board's decision upholding the disallowance was rationally based, that the guideline criteria were rationally related to identification of an IMD, and that no one criterion was determinative. It finds the State's argument against the "51% rule" unfounded here when at least 86% of the patients at each of the three facilities had diagnoses of a mental disease. It maintains that adoption of Minnesota's position focusing on type of care given would result in rewarding facilities which do not provide the services required by patients' diagnoses.

■ We hold that the Board's interpretation of its regulation defining an IMD, and its extensive reliance on diagnoses-based criteria for the purpose of revealing the overall character of an IMD, were inconsistent with the provisions and purposes of the Social Security Act. *Accord Connecticut v. Schweiker,* 557 F.Supp. 1077,

1091 (D.Conn.1983). We find that the characterization of an IMD must fundamentally center on the type of care or nature of services required, not on the mere presence in a facility of patients who have, or at one time did have, diagnoses of a mental disease. Thus, because insufficient fact finding was performed on the proper basis, we hold that the Board's decision upholding the disallowance was not supported by substantial evidence on the record as a whole.

Our conclusion is rooted in the language of section 1396d defining "medical assistance," and is supported by legislative history as well as other statutory provisions of the Social Security Act. The skeletal framework of allowable "medical assistance" payments in section 1396d(a) is built around various types and levels of care; the section specifies payments for "inpatient hospital *services*," "skilled nursing facility *services*," "intermediate care facility *services*," "inpatient psychiatric hospital *services*," and so on. 42 U.S.C. § 1396d(a)(1), (4)(A), (15), (16) (1976). The statute specifies payments for "intermediate care facility *services . . . for individuals* who are determined, in accordance with section 1396a(31)(A) of this title, to be *in need of such care*." [18] 42 U.S.C. § 1396d(a)(15) (1976) (emphasis added).

Section 1396d(c) defining an "intermediate care facility" [19] supplies manifest clarification not only of what an ICF is, but more importantly for our purposes, how an IMD is and is not to be exclusively characterized. The ICF definition expressly authorizes care of patients in an ICF with diagnoses of either "mental or physical condition[s]" as long as the illnesses involved "require" a lesser "degree of care and treatment" than a hospital or SNF provides.[20] *Cf. Pinneke v. Preisser,* 623 F.2d 546, 550 (8th Cir.1980) (statutory limitations for IMDs "do not apply to mental health problems in general").

The legislative history of the IMD exclusion and ICF coverage reinforces the statutory language that Medicaid benefits cannot be denied solely on the ground that an institution primarily serves mental patients and that the paramount criterion for distinguishing an IMD from an ICF must be the degree of care and treatment required by patients. The limitation in the Social Security Act for patients in an "institution for mental diseases" was first enacted in 1950 based on the reason that " 'long-term care in such hospitals had traditionally been accepted as a responsibility of the States.' " *Schweiker v. Wilson,* 450 U.S. 221, 237 n. 19, 101 S.Ct. 1074, 1084 n. 19, 67 L.Ed.2d 186 (1981); *see id.* at 225 n. 5, 101 S.Ct. at 1078 n. 5. A House report in 1963 stressed the deficiencies of the "State mental institutions": "Only a small percentage of the institutions can be said to be therapeutic and not merely custodial. In 1959, there . . . [was] less than 1 psychiatrist for 500

---

**18.** Likewise, the definitions of "inpatient hospital services for individuals under age 21," "skilled nursing facility services," and ICF care for the mentally retarded all center on the nature of care required by patients. The term "inpatient psychiatric hospital services for individuals under age 21" includes only "*active treatment . . . necessary on an inpatient basis* and can reasonably be expected to improve the condition, by reason of which *such services are necessary, to the extent that eventually such services will no longer be necessary*." 42 U.S.C. § 1396d(h)(1)(B) (1976) (emphasis added).

The term skilled nursing facilities means "services which are or were required to be given an individual who needs or needed on a daily basis skilled nursing care . . . or other skilled rehabilitation services." *Id.* § 1396d(f).

As to care for the mentally retarded, section 1396d(d) states:

The term "intermediate care facility services" may include *services* in a public institution (or distinct part thereof) for the mentally retarded or persons with related conditions if—

(1) *the primary purpose* of such institution (or distinct part thereof) *is to provide health or rehabilitative services* for mentally retarded individuals and . . .

(2) *the mentally retarded individual . . . is receiving active treatment* under such a program . . . .

*Id.* (emphasis added).

**19.** *See supra* p. 861.

**20.** Many persons within an ICF may be deaf or blind or have other physical ailments in conjunction with associated mental problems.

patients." H.R.Rep. No. 694, 88th Cong., 1st Sess. 11, *reprinted in* 1963 U.S.Code Cong. & Ad.News 1054, 1064.

In contrast, the Medicaid program, which was enacted as Title XIX of the Social Security Act in 1965, was "designed to alleviate the cost of health care which is active and remedial rather than custodial in nature." *Legion v. Richardson,* 354 F.Supp. 456, 459 (S.D.N.Y.), *aff'd sub nom. Legion v. Weinberger,* 414 U.S. 1058, 94 S.Ct. 564, 38 L.Ed.2d 465 (1973); *accord Woe v. Matthews,* 408 F.Supp. 419, 425 n. 16 (E.D.N.Y. 1976), *aff'd mem. sub nom. Woe v. Weinberger,* 562 F.2d 40 (2d Cir.1977), *cert. denied,* 434 U.S. 1048, 98 S.Ct. 895, 54 L.Ed.2d 799 (1977). The purpose of Title XIX is expressly decreed "to furnish . . . medical assistance . . . , rehabilitation and other services to help . . . individuals attain or retain capability for independence or self-care." 42 U.S.C. § 1396 (1976).

■ Congress recognized the "great strides in the field of mental disease" which allowed the development of mental health programs "to cure the patients and release them from the institutions, instead of requiring them to spend the rest of their lives in them." 111 Cong.Rec. 21, 348–49 (1964) (statements of Sen. Long). Congress thus authorized exceptions to the IMD exclusion in 1965 for the mentally ill in general medical facilities and for individuals age 65 and over in IMDs.[21] However, the exceptions were granted on the condition that the states arrange with IMDs to develop alternative methods of care for all mental patients, "particularly for the aged who are mentally ill." S.Rep. No. 404, 89th Cong., 1st Sess. 146, *reprinted in* 1965 U.S.Code Cong. & Ad.News 1943, 2085; *see Connecticut v. Schweiker,* 557 F.Supp. at 1083 n. 13,

1084 n. 15. This legislation, requiring "plans for the use of other methods of care, such as nursing homes, short-term care in general hospitals, foster family care, and others," besides the standard "[i]nstitutional treatment and care in the individual's own home," was intended to "give further encouragement to the trend in the States for discharging from mental hospitals to the community the aged who are considered able to care for themselves, under some form of protective arrangements." S.Rep. No. 404, 89th Cong., 1st Sess. 146, *reprinted in* 1965 U.S.Code Cong. & Ad.News 1943, 2085. *See* 42 U.S.C. § 1396a(a)(20), (21) (1976 & Supp. V 1981).

ICF coverage was added to the Medicaid provisions in 1971 and was explicitly intended for persons who "in the absence of intermediate care would require placement in a skilled nursing home *or mental hospital.*" Report of Senate Finance committee, printed in Statement of Sen. Long, 117 Cong. Rec. 44721 (1971) (emphasis added). The development of ICFs was a direct response to the congressional aim of providing the most appropriate placement required by a patient's physical or mental health needs. The committee report on ICFs stressed the concern that "each patient for whom Federal funds is provided is in the right place at the right time receiving the right care. . . . Each skilled nursing home, each mental hospital patient, and each intermediate care patient must be individually reviewed by an independent team to assure proper placement." *Id.* The report recited the congressional desire to "provide a less costly institutional alternative" than "skilled nursing home care" for patients who needed care "less extensive than skilled nursing home care." *Id.*[22]

---

**21.** In discussing the bill removing the exclusion for those over age 65, Senator Carlson observed: "Whether an individual of advanced years is merely senile or has a mental disease is a fine line and it may be appropriate for him at one time to be in a mental institution and at another to be in a nursing home, his own home, or in some other arrangement." 111 Cong.Rec. 21, 349 (1964). Appropriate patient placement was thus a motivating factor in removing the IMD exclusion for those age 65 and over. *Ac-*

*cord Connecticut v. Schweiker,* 557 F.Supp. at 1083 n. 13.

**22.** In 1972, Congress "further broadened Medicaid benefits for the mentally ill to include most children in mental institutions." *Schweiker v. Wilson,* 450 U.S. at 226 n. 5, 101 S.Ct. at 1078 n. 5. *See* 42 U.S.C. § 1396d(a)(16) (1976 & Supp. V 1981) ("inpatient psychiatric hospital services for individuals under age 21"). Congress simultaneously

The impropriety of focusing upon a diagnosis of mental illness is also supported by congressional directives prohibiting discrimination on the basis of diagnosis, 42 U.S.C. § 1396a(a)(10) (1983), or handicap, 29 U.S.C. § 794 (1976 & Supp. V 1981).[23] An HHS Medicaid regulation in accord declares that a "Medicaid agency may not arbitrarily deny or reduce the amount, duration, or scope of a required service . . . to an otherwise eligible recipient solely because of the diagnosis, type of illness, or condition." 42 C.F.R. § 440.230(c) (1982).[24]

In a recent case involving eligibility for Supplemental Security Income benefits which were tied into Medicaid eligibility, the Supreme Court determined that the exclusion of benefits to any "inmate of a public institution" could not be classified directly on the basis of a diagnosis relating to mental health. *Schweiker v. Wilson,* 450 U.S. at 224–25, 231, 101 S.Ct. at 1077–78, 1081. Congress, the Court said, distinguished not between the mentally ill and a group composed of nonmentally ill, but between residents in public institutions receiving Medicaid funds for their care and residents in such institutions not receiving

Medicaid funds. *Id.* at 232–33, 101 S.Ct. at 1081–82.

Unlike the situation in *Wilson,* however, here the stipulated criteria directly classify by mental diagnoses in order to determine whether an institution should receive Medicaid funds.

■■■ By its very nomenclature, a threshold requirement for an "institution for mental diseases" must be the presence of patients with a mental disease. However, most of the interpretive criteria in dispute here directly pertain to the mere existence of present or past mental disabilities of the patients in a facility. When HHS interprets the major distinctive features of an IMD to turn on this factor, it negates a portion of the statute by encroaching upon the intended role Congress determined intermediate care facilities were designed to serve.[25] An agency's interpretation of its own regulations cannot emasculate the plain meaning of the governing statute. *See United States v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 519–20, 99 L.Ed. 615 (1955).

defeated a Senate proposal for demonstration projects to evaluate the "potential social and economic benefits of extending medicaid inpatient mental hospital coverage to mentally ill persons between the ages of 21 and 65." S.Rep. No. 1230, 92d Cong., 2d Sess. 280–81 (1972); *see* H.R.Conf.Rep. No. 1605, 92d Cong., 2d Sess. 65, *reprinted in* 1972 U.S.Code Cong. & Ad.News 4989, 5398.

23. HHS regulations under section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1976) define "handicap" to include any mental disorder. *See* 45 C.F.R. § 84.3(j) (1982).

24. The State's brief quotes statements of HHS in the early 1970's that " '[f]ederal sharing with the States is available for the cost of most types of care for the mentally ill because Title XIX prohibits elimination of patients from the program on the basis of diagnosis.' " Brief for petitioner at 30, *quoting* Social Security Administration, Office of Research and Statistics, U.S. Dept. of H.E.W., Research Report No. 37, Financing Mental Health Care Under Medicare and Medicaid 39 (1971).

25. The agency itself has expressed doubts as to the validity and effectiveness of some of the guidelines. A Discussion Paper of "Redefini-

tion On Institution For Mental Diseases" observed:

These guidelines lack regulatory force and contain some criteria that are of questionable applicability in determining whether a facility is an IMD, e.g., whether the facility is located within a 25-mile radius of a State mental hospital. . . . [W]e believe that objective criteria for identifying an IMD need to be incorporated into the regulations. We exercised [sic] the possibility of incorporating criteria related to the percentage of mentally ill individuals in skilled nursing facilities and intermediate care facilities. *We have reservations about this, however, because the criteria (particularly the numerical criterion) do not necessarily indicate the nature of the services being furnished by the facility* and enforcement may provide an undesirable incentive for substitution of nonpsychiatric diagnoses and transfer of patients to avoid reaching the guideline percentile.

Letter from Tera S. Younger, HCFA Long Term Care Policy Group, to B.F. Simmons (Nov. 3, 1980) (Discussion Paper attached) (emphasis added).

We do not find it necessary to explore fully the degree of care and treatment that only placement in an IMD can provide. It certainly includes treatment similar to "inpatient psychiatric hospital services" as defined for individuals under age 21 in section 1396d(h)(1)(B). *See supra* note 18; 42 U.S.C. § 1396d(a)(16) (1976 & Supp. V 1981). Legislative history is clear that in allowing such coverage for children, Congress intended to make an exception to the under-age-65 IMD exclusion. S.Rep. No. 1230, 92d Cong., 2d Sess. 280–81 (1972); *see Kantrowitz v. Weinberger,* 388 F.Supp. 1127, 1129–30 (D.D.C.1974), *aff'd,* 174 U.S. App.D.C. 182, 530 F.2d 1034, *cert. denied,* 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976); *cf.* 42 C.F.R. § 440.140(a)(ii) (1982) (IMDs must meet general requirements of a psychiatric hospital to be included in Medicaid coverage for those over age 64). IMD treatment may thus include a higher degree of care and treatment than is provided by facilities which only offer SNF or ICF services. However, based on legislative history, it also may include custodial "room and board" care which is not aimed at simultaneously providing active or therapeutic treatment leading to cure. *See supra* at 863–864; *Connecticut v. Schweiker,* 557 F.Supp. at 1084–85; *Woe v. Matthews,* 408 F.Supp. at 422, 426–29 & n. 23.[26]

We conclude that the agency acted contrary to statutory provisions and congressional intent when, to identify the overall character of these three facilities as IMDs, it employed criteria chiefly focusing on the mere presence in each facility of patients with diagnoses of a mental disability. We hold that the cardinal gauge by which to distinguish IMDs and ICFs must be the degree of care and treatment required by the mental or physical conditions of patients residing at any given facility.[27] We thus hold that the Board's decision upholding the disallowance to the State was unsupported by substantial evidence on the record as a whole. We reverse the decision and remand to HHS. We do not reach the procedural issues raised by the State pertaining to the requirements of the Administrative Procedure Act, 5 U.S.C. § 552 *et seq.* (1982), that the guidelines employed must be published.

The district court is thus affirmed in part in its grant of summary judgment to the State and denial of summary judgment to HHS. The district court's order is vacated

---

**26.** The district court found that "by 'institution for mental diseases' the Congress intended to refer to those institutions which provided primarily long-term care for the mentally ill by administering psychiatric treatment for its residents on the premises." *Minnesota v. Schweiker,* No. 4–82–155, slip op. at 15 (D.Minn. Aug. 25, 1982).

The district court in *Connecticut v. Schweiker,* 557 F.Supp. at 1081 n. 8, expressly disagreed with this characterization, finding that long-term care and psychiatric care are not necessary for a facility to be an IMD, but that "total care" is. That court defined "total care" to mean "the very high level of care given, for example, to a hospital inpatient or a nursing home resident. The patient is totally dependent on the institution and is submerged in it." *Id.* at 1081 n. 9.

*Cf. Schweiker v. Wilson,* 450 U.S. at 233 n. 17, 101 S.Ct. at 1082 n. 17 ("the average inpatient stay in public mental hospitals is short"; the "rapidity with which inpatients are released from public institutions has increased since the 1950's").

**27.** The degree of care and treatment *required* by a patient's mental or physical condition should be equivalent to the degree of care and treatment *furnished* to the patient by a facility. Emphasis on the degree of care and treatment required by patients in order to determine whether the overall character of a facility is that of an IMD should eliminate HHS' concern that a facility would be rewarded if the nature of its services did not sufficiently provide the level of care required by a patient's mental diagnosis. The statute requires that state plans for medical assistance provide for independent professional review of the need for intermediate care prior to admission in an ICF, and periodic review of the type and adequacy of care being provided, the necessity and desirability of continued ICF placement, and the feasibility of meeting a patients' need through alternative institutional or non-institutional services. 42 U.S.C. § 1396a(a)(31) (1976); 42 C.F.R. part 456 (1982); *see Colorado Department of Social Services v. Department of Health and Human Services,* 558 F.Supp. 337, 340–47, 348–55 (D.Colo.1983). By disputing individual placement decisions, HHS can insure the equivalency of the degree of care and treatment rendered by a facility and the degree required by patients.

for lack of jurisdiction as to that portion of the order which requires that the Secretary shall return to the State the federal funds withheld pursuant to the disallowance.

The petition filed by the State of Minnesota (No.　　) for direct review of the agency's decision is dismissed for lack of jurisdiction.