731 F.2d 1052
 4 Soc.Sec.Rep.Ser. 331, Medicare&Medicaid Gu 33,696
STATE OF CONNECTICUT, DEPARTMENT OF INCOME MAINTENANCE,
Plaintiff-Appellee,
v.
Margaret M. HECKLER, Secretary, and the United States
Department of Health and Human Services,
Defendants-Appellants.
 No. 245, Docket No. 83-6105.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 26, 1983.
Decided March 30, 1984.
 
 Charles A. Miller, Washington, D.C. (Joan E. Donoghue, Covington & Burling, Washington, D.C., Joseph I. Lieberman, Atty. Gen., State of Conn., Edmund Walsh, Asst. Atty. Gen., State of Conn., Hartford, Conn., on the brief), for plaintiff-appellee.
 Susanne M. Lee, Washington, D.C. (Juan A. del Real, Ann T. Hunsaker, Dept. of Health and Human Services, Washington, D.C., on the brief), for defendants-appellants.
 Before MANSFIELD, KEARSE and WINTER, Circuit Judges.
 WINTER, Circuit Judge:
 
 
 1
 The United States Department of Health and Human Services ("HHS") appeals from Judge Blumenfeld's decision that HHS improperly disallowed Medicaid payments to the State of Connecticut Department of Income Maintenance ("Connecticut") for services provided patients at Middletown Haven Rest Home ("Middletown Haven"). Judge Blumenfeld held that the statutory provisions relied on by HHS only preclude Medicaid payments for services rendered at "mental hospitals," which are "facilities which ... provide total care to mental patients." Connecticut v. Schweiker, 557 F.Supp. 1077, 1090-91 (D.Conn.1983). Because Middletown Haven, a duly certified intermediate-care facility ("ICF"), does not provide total care to such patients, Judge Blumenfeld concluded that HHS wrongfully had disallowed Medicaid payments for services provided there.
 
 
 2
 We reverse.
 
 BACKGROUND
 
 3
 This case arises under the Medicaid legislation, Title XIX of the Social Security Act, enacted as part of the Social Security Amendments of 1965, Pub.L. No. 89-97, Sec. 121, 79 Stat. 286, 343-52 (codified as amended at 42 U.S.C. Sec. 1396 et seq.). Congress established Medicaid "for the purpose of providing federal financial assistance to States that choose to reimburse certain costs of medical treatment for needy persons." Harris v. McRae, 448 U.S. 297, 301, 100 S.Ct. 2671, 2680, 65 L.Ed.2d 784 (1980). Medicaid provides federal financial assistance for certain categories of medical treatment, including "inpatient hospital services (other than services in an institution for ... mental diseases)," 42 U.S.C. Sec. 1396d(a)(1), "skilled nursing facility services (other than services in an institution for ... mental diseases)," id. at Sec. 1396d(a)(4A), and "intermediate care facility services (other than such services in an institution for ... mental diseases)," id. at Sec. 1396d(a)(15). This assistance is also subject to two blanket provisions, one forbidding federal financial assistance "with respect to care or services for any individual who has not attained 65 years of age and who is a patient in an institution for ... mental diseases," id. at Sec. 1396d(a)(18)(B), and the other authorizing federal financial assistance for "inpatient hospital services, skilled nursing facility services, and intermediate care facility services for individuals 65 years of age or over in an institution for ... mental diseases," id. Sec. 1396d(a)(14).
 
 The statute defines ICF's as
 
 4
 licensed under State law to provide, on a regular basis, health-related care and services to individuals who do not require the degree of care and treatment which a hospital or skilled nursing facility is designed to provide, but who because of their mental or physical condition require care and services (above the level of room and board) which can be made available to them only through institutional facilities.
 
 
 5
 Id. Sec. 1396d(c). The term "institution for mental diseases" ("IMD") is not defined in the statute but has been interpreted by HHS to mean any institution "primarily engaged in providing diagnosis, treatment or care of persons with mental diseases." 42 C.F.R. Sec. 435.1009. The parties agree that the dispositive issue in the instant case is whether an ICF such as Middletown Haven can be deemed an IMD, given the foregoing statutory and regulatory framework.
 
 
 6
 Because the statutory provisions at issue here were enacted in a piecemeal fashion, the sequence as well as the substance of the various parts of the statutory scheme is significant. The original Medicaid statute authorized federal financial assistance for inpatient hospital services and skilled nursing facility services except when rendered in an IMD, Pub.L. No. 89-97, Sec. 121(a), 79 Stat. 286, 351 (1965) (codified as amended at 42 U.S.C. Sec. 1396d(a)(1), (4)(A)). The original statute also contained the blanket provisions authorizing financial assistance for those services to patients 65 or older in IMD's, id., 79 Stat. at 352 (codified as amended at 42 U.S.C. Sec. 1396d(a)(14)), but precluding it for those services to patients under age 65 in an IMD, id. (codified as amended at 42 U.S.C. Sec. 1396d(a)(18)(B)). The original Medicaid statute made no provision for financial assistance for ICF services.
 
 
 7
 In 1967, Congress authorized federal assistance for ICF services under special programs for the aged, the blind and the disabled. Social Security Amendments of 1967, Pub.L. No. 90-248, Sec. 250, 81 Stat. 821, 920 (repealed 1971). ICF coverage to those eligible under the Medicaid program was authorized in 1971, Pub.L. No. 92-223, Sec. 4, 85 Stat. 802, 809 (1971), when Congress repealed the 1967 legislation and brought ICF coverage under the Medicaid program. However, in doing so, Congress expressly excluded ICF services rendered in an IMD.[1] Id. Sec. 4(a)(1)(C), 85 Stat. 802, 809 (codified as amended at 42 U.S.C. Sec. 1396d(a)(15)). The ICF definition adopted in the 1971 Medicaid legislation, which is quoted supra, resembled that used in the 1967 legislation, except that the 1971 definition explicitly stated that "the term 'intermediate care facility' shall not include ... any public institution or distinct part thereof for mental diseases or mental defects." Id. Sec. 4(a)(2) (codified at 42 U.S.C. Sec. 1396d(c)). An exception to this general exclusion was made for public institutions treating the mentally retarded. Id. (codified at 42 U.S.C. Sec. 1396d(d)). The 1971 definition is the one at issue in the instant case.
 
 
 8
 From the time that Middletown Haven began operation as an ICF in 1977, Connecticut received federal Medicaid funds to help defray the costs of services provided patients at the facility. The legality of this arrangement came under scrutiny in December, 1979, when an audit team from HHS undertook a study of patient records at Middletown Haven. The study was conducted as part of an investigation by HHS to determine whether certain states were discharging patients from mental hospitals and arranging their placement in ICF's in order to circumvent the Medicaid exclusion for patients under age 65 in IMD's. Applying internal criteria developed by HHS and intended to supplement the IMD definition set forth in the regulations,[2] the audit team concluded that Middletown Haven was an IMD. In drawing this conclusion, it found, inter alia, that 77% of the patients treated from January, 1977 through December, 1979 were suffering from a major mental disease that was responsible in substantial part for their need of ongoing care, that more than 50% of the patients had been admitted directly from state mental hospitals, and that Middletown Haven hired professional staff, including three psychiatrists, who specialized in the care of the mentally ill. Following the audit team's report, HHS disallowed all Medicaid payments made for services provided patients at Middletown Haven between January, 1977 and September, 1979--an amount totalling $1,634,655.[3]
 
 
 9
 Connecticut then sought agency review of the disallowance. Its appeal, consolidated with appeals from similar disallowances by the states of Minnesota, Illinois and California, was heard before the Departmental Grant Appeals Board of HHS. On November 30, 1981, the appeals were denied in all respects, a decision which constituted the final administrative agency action in this matter. Each state then sought judicial review. Connecticut petitioned for direct appellate review--an action we earlier dismissed for want of jurisdiction, Connecticut v. Schweiker, No. 82-4023 (2d Cir. Apr. 20, 1982)--and also filed a complaint in district court seeking reversal of the disallowance.[4] Ruling on cross motions for summary judgment, Judge Blumenfeld reversed the agency decision, concluding that the IMD definition used by HHS in ordering the disallowance was incompatible with the congressional intent underlying the IMD exclusion. This appeal followed.
 
 DISCUSSION
 
 10
 Having previously decided that direct appellate jurisdiction is not available in this case, our threshold task is to determine whether jurisdiction exists in any federal court to review the decision of the HHS Departmental Grant Appeals Board. Because the decision is in every sense a "final agency action for which there is no other adequate remedy in a court," Administrative Procedure Act, 5 U.S.C. Sec. 704 (1976), judicial review is available unless clearly forbidden by Congress. Abbott Laboratories v. Gardner, 387 U.S. 136, 140-41, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967). We agree with the Ninth Circuit that there is no indication that Congress meant to bar review of disallowance decisions, County of Alameda v. Weinberger, 520 F.2d 344, 347-49 (9th Cir.1975), and thus proceed to the merits.
 
 
 11
 The gravamen of Connecticut's argument is that the IMD exclusion was intended to foreclose federal financial assistance only for services provided in traditional state mental hospitals. Contending that IMD's and ICF's are mutually exclusive categories of institutions, Connecticut maintains that Congress intended that federal assistance be available for the services in question so long as they are provided in ICF's. The policy supposedly underlying this distinction is designed to encourage the placement of mental patients in ICF's, an alternative and favored type of facility. In short, according to Connecticut, what mattered to Congress was not that IMD patients suffered a particular type of illness, but that they were treated in a type of facility that Congress was unwilling to fund.
 
 
 12
 We disagree with that view of the statute. Both the statutory language and the legislative history demonstrate that, with certain specific exceptions not at issue, Congress has explicitly declined to permit the use of Medicaid funds for custodial care and treatment of the mentally ill under age 65, regardless of the type of facility in which that care and treatment are provided. Because the criteria used by HHS in designating Middletown Haven an IMD seem reasonably tailored to implement this Congressional intent, the disallowance was proper. Accordingly, we reverse.
 
 
 13
 Our analysis begins with the language of the statute. In Connecticut's view, the most significant statutory provision is the definition of ICF, which explicitly mentions care offered to patients who require it "because of their mental ... condition." 42 U.S.C. Sec. 1396d(c)(1). Connecticut invokes the inclusion of this language as proof that Congress intended that Medicaid funds be available for services to mental patients provided in ICF's such as Middletown Haven.
 
 
 14
 There is logic in that argument, but it is not conclusive since the statutory language may refer to ICF treatment of some but not all categories of mental patients. If a state has chosen to extend Medicaid coverage to persons age 65 and over in IMD's, see supra, note 3, such persons are covered for mental conditions regardless of whether treatment is provided in a hospital, skilled nursing facility or ICF, id. Sec. 1396d(a)(14). The language may thus refer to aged patients with mental illness. Second, the statute clearly provides for the establishment of public ICF's for the treatment of the mentally retarded, id. Sec. 1396d(d), and the language may also apply to patients in this category. Third, all parties agree that an ICF is not rendered an IMD simply by providing treatment to some patients who require it because of mental condition; rather, the test is whether the "overall character" of a facility makes it an IMD, 42 C.F.R. Sec. 435.1009. The statutory definition of ICF can logically, therefore, include institutions with mental patients without extending federal assistance to all such patients, since it is clear that some mental patients in ICF's are not excluded from Medicaid assistance.
 
 
 15
 Like Connecticut, HHS relies upon a statutory provision which it regards as conclusive. That provision authorizes the payment of Medicaid funds for "intermediate care facility services (other than such services in an institution for ... mental diseases)." 42 U.S.C. Sec. 1396d(a)(15). In HHS's view, Congress forbade the use of Medicaid funds to cover ICF services provided in an IMD, a term which Congress did not define but which HHS has reasonably construed to include any institution primarily engaged in the treatment of mental diseases. 42 C.F.R. Sec. 435.1009. Connecticut rejoins that the ban on reimbursement for ICF services provided in an IMD simply means that ICF services are not covered only if they are provided in a type of institution excluded under the statute, i.e. the IMD or traditional mental hospital. In Connecticut's view, Congress phrased the exclusion in order to prevent states from obtaining Medicaid reimbursement for ICF-level services provided in traditional mental hospitals; conversely, it argues, so long as ICF services are offered in independent ICF's, Congress intended that Medicaid funds be available. Thus, Connecticut argues, because ICF's and IMD's are mutually exclusive types of facilities and Congress did not contemplate circumstances under which an ICF would be confused with an IMD, the exclusion for ICF services rendered in an IMD is irrelevant.
 
 
 16
 We believe HHS's view is the more plausible. First, Connecticut's reading asks us to believe that, while Congress intended to encourage the use of ICF's, it expressly forbade financial assistance to effect even the partial transformation of state mental hospitals into ICF's. We perceive no reason whatsoever to conclude that Congress intended to deter the development of ICF's within the traditional hospital, particularly since transforming part of an existing facility might be considerably less expensive than development of a new institution. The distinction proffered by Connecticut treats an ICF operated within an IMD differently from an independent ICF even though the nature of the patients treated and services offered are identical. No congressional purpose calling for such an artificial distinction has been offered, and we have found none in our independent research.
 
 
 17
 Second, the statutory language strongly suggests that Congress believed that even an independent ICF which provided care and services to the mentally ill might be an IMD. Congress authorized the payment of Medicaid funds for "inpatient hospital services (other than services in an institution for ... mental diseases)," 42 U.S.C. Sec. 1396d(a)(1), for "skilled nursing facility services (other than services in an institution for ... mental diseases)," id. Sec. 1396d(a)(4A), and "intermediate care facility services (other than such services in an institution for ... mental diseases)," id. Sec. 1396d(a)(15). Unless one accepts the artificial distinction between an ICF operated independently of an IMD and an ICF connected with an IMD, these identical exclusions strongly imply that Congress contemplated that any of the three types of facilities--the hospital, the skilled nursing facility and the ICF--might qualify under certain circumstances as an IMD. Moreover, the definition of an ICF states that "the term 'intermediate care facility' shall not include ... any public institution ... for mental diseases or mental defects," 42 U.S.C. Sec. 1396d(c), except for public ICFs "for the mentally retarded or persons with related conditions," id. Sec. 1396d(d). Since the exclusion for IMD's does not distinguish between public and private facilities, the combination of Sections 1396d(a)(15), 1396d(c) and 1396d(d) makes sense only as a statement that ICF's which are IMD's are excluded from the definition except those public ICF/IMD's which care for the mentally retarded. In short, the provisions are meaningless unless some ICF's are IMD's and thus subject to the statutory exclusion.
 
 
 18
 A review of the legislative history fully supports the view that these provisions are not meaningless but the result of a conscious congressional design to support care for the elderly suffering from mental illness, including the encouragement of alternatives to the traditional mental hospital, while excluding coverage to those under age 65. The forerunner of the IMD exclusion was enacted in 1950, when Congress authorized the payment of federal old-age assistance to the elderly residing in public medical institutions.[5] Social Security Amendments of 1950, Pub.L. No. 81-734, Sec. 303(a), 64 Stat. 477, 549. Congress refused, however, to authorize such payments for the elderly residing in "public or private institutions for mental illness or tuberculosis," on the grounds that care of such patients traditionally had been the responsibility of the states. H.R.Rep. No. 1300, 81st Cong., 1st Sess. 42 (1949).
 
 
 19
 The original IMD exclusion, as amended,[6] continued in force until 1965, when Congress enacted the Medicaid statute and established a comprehensive program of federal financial assistance for medical care to the indigent. That statute made federal financial assistance for the treatment of the mentally ill dependent on age. With respect to care provided the indigent mentally ill under age 65, no federal funds were available for treatment in IMD's, but such funds were available for treatment provided in general hospitals. With respect to the indigent over 65, the Medicaid statute omitted an IMD exclusion analogous to the one which was enacted some fifteen years before. An expressly stated purpose behind lifting the IMD exclusion for those over 65 was to encourage states to permit the elderly to receive mental health care in a variety of settings that would serve as alternatives to confinement in the traditional mental hospitals; among these alternatives were nursing homes, general hospitals and foster families. S.Rep. No. 404, Pt. 1, 89th Cong., 1st Sess. 145, reprinted in 1965 U.S.Code Cong. & Ad.News 1943, 2084-87. Indeed, state access to Medicaid funds for the treatment of aged persons in IMD's was contingent on the development of state plans for the provision of alternative forms of mental health care to the elderly. Social Security Amendments of 1965, Pub.L. No. 89-97 Sec. 121(a), 79 Stat. 286, 347 (codified at 42 U.S.C. Sec. 1396a(a)(20), (21)); see S.Rep. No. 404, supra, at 145.
 
 
 20
 Much of Connecticut's argument that Congress intended to encourage the provision of alternative care to that provided in traditional mental hospitals is actually drawn from legislative history explaining Congress's decision to lift the IMD exclusion as to the elderly. See, e.g., Brief of Appellee at 18-19. Similarly, congressional discussion of alternative types of care took place in the context of treatment provided to the elderly. See, e.g., S.Rep. No. 404, supra, at 145. Lengthy and repeated quotation from the legislative history concerning alternative types of care for the elderly merely underlines the absence of any such history supporting Connecticut's position as to persons under age 65, a central issue in the instant litigation. The fundamental and ultimately fatal weakness of Connecticut's argument is the undeniable fact that Congress has never lifted the longstanding IMD exclusion for persons under age 65 or even indirectly implied such a purpose in the legislative history.
 
 
 21
 To the contrary, on at least three of the occasions on which Congress amended the Medicaid program in the seven years after 1965, explicit proposals to lift the IMD exclusion as to those under age 65 were made in hearings on the Medicaid legislation to no avail. On each occasion a proposal was made to make Medicaid funding available for the treatment for the mentally ill under age 65, not simply in traditional mental hospitals, but also in alternative treatment settings. In 1967 the Senate Finance Committee was told during hearings on Medicaid legislation that the effect of the broad availability of Medicaid funds for the treatment of the elderly mentally ill was to permit "the psychiatrist to utilize the full range of modern psychiatric facilities for the treatment of the older patient," but that the effect of the IMD exclusion for the population under age 65 was to preclude Medicaid funds for the treatment of the mentally ill under age 65 in any "mental institution, whether it be a public or private mental hospital, or even a community health center." Social Security Amendments of 1967: Hearings on H.R. 12080 Before the Senate Comm. on Finance, Pt. 3, 90th Cong., 1st Sess. 1741 (1967) (Statement of Dr. Robert W. Gibson, Am. Psychiatric Ass'n). Nevertheless, Congress refused to act.
 
 
 22
 This appeal was renewed in Senate hearings in 1970, and once again Congress refused to change the law. See Social Security Amendments of 1970: Hearings on H.R. 17550 Before the Senate Comm. on Finance, Pt. 2, 91st Cong., 2d Sess. 500-50 (1970). Moreover, in the same hearings, supporters of expanded federal assistance for the mentally ill and mentally retarded protested the House's modification of the statutory definition of an ICF.[7] See, e.g., id. at 504-09 (Testimony of Kenneth D. Gaver, M.D., Administrator, Or. Div. Mental Health). The House language modified the ICF definition to exclude "any public institution (or distinct part thereof) for mental diseases or mental defects." H.R. 17550, 91st Cong., 2d Sess. Sec. 225(b)(2) (1970). The Senate was warned by those proposing expanded financial assistance to the mentally ill that for those patients eligible for federally supported ICF services, this language would forbid "a supportive program of care of a semimedical nature" for the mentally ill and a "supportive program of care of a social service-rehabilitative type" for the mentally retarded. Id. at 501-02 (Testimony of Harry Schnibbe, Executive Director, Nat'l Ass'n of State Mental Health Program Directors). When ICF services were made part of the Medicaid program in December, 1971, the language passed by the House in reference to the earlier ICF program was retained but modified to permit support for public ICF's treating the mentally retarded. Pub.L. No. 92-223, Sec. 4, 85 Stat. 802, 809 (1971) (codified at 42 U.S.C. Sec. 1396d(c), (d)). For present purposes the most conspicuous feature of the statutory definition of an ICF is the absence of any provision authorizing public ICF's for the mentally ill, although this too had been sought in the hearings before the Senate Finance Committee. This episode thus suggests two conclusions: (1) Congress did not consider ICF's and IMD's as mutually exclusive categories; and (2) Congress declined to enact an ICF definition which included ICF's treating the mentally ill, although it was explicitly asked to do so.
 
 
 23
 The third, and for purposes of our inquiry most important, effort to eliminate the IMD exclusion occurred in January, 1972. See Social Security Amendments of 1971: Hearings on H.R. 1 Before the Senate Comm. on Finance, Pt. 2, 92nd Cong., 1st & 2nd Sess. 924 (1972) (Statements of Dr. Jonathan Leopold, Comm'r, Vt. Dept. of Mental Health & Dr. Kenneth Gaver, Comm'r, Ohio Dept. of Mental Hygiene & Corrections). In these hearings, which occurred some three weeks after passage of the legislation which brought ICF coverage under the Medicaid program and which Connecticut claims is dispositive of this litigation, the Senate Finance Committee heard for the third time an appeal by state mental health officials to lift the IMD exclusion for those under age 65. As part of this appeal, the salutary consequences of lifting the IMD exclusion for the aged were described; one such consequence was that elderly patients were discharged from traditional state mental hospitals "into nursing homes, into intermediate care facilities" and into other alternative settings. Id. at 928 (emphasis added). The state officials argued that "[t]he principle of equity requires that the benefits presently provided to mentally ill persons over 65 be made available to persons of all ages." Id. at 929. These officials thus believed that under the then existing statutory framework--a framework virtually identical to the one at issue in the instant litigation--states could not discharge patients under age 65 from mental hospitals, arrange their placement in ICF's and then look to the Medicaid program for financial support.
 
 
 24
 Responding to this presentation, Senator Long, Chairman of the Senate Finance Committee and a key political figure in the legislative process, warned state officials that their proposal would be perceived as too costly and asked whether as an alternative they would "support an amendment to cover the mentally ill [under age 65] under Medicaid who receive active care and treatment in an accredited medical institution." Id. at 929. Ultimately, Congress provided even less than the compromise offered by Senator Long, for it approved only limited relief from the IMD exclusion by permitting the use of Medicaid funds for inpatient psychiatric hospital services to patients under age 21. Pub.L. No. 92-603, Sec. 299B, 86 Stat. 1329, 1460-61 (1972) (codified at 42 U.S.C. Sec. 1396d(a)(16), (h)). A pilot program approved by the Senate to test "the potential benefits of extending medicaid mental hospital coverage to mentally ill persons between the ages of 21 and 65" was rejected by the House and dropped in conference. See S.Rep. No. 1230, 92d Cong., 2d Sess. 57; H.R.Rep. No. 1605, 92d Cong., 2d Sess. 65 (Conf.Rep.), reprinted in 1972 U.S.Code Cong. & Ad.News 4989, 5370, 5398. The IMD exclusion thus remained virtually in full force, as Congress declined to extend full Medicaid coverage for the treatment of the mentally ill between the ages of 21 and 65.
 
 
 25
 The import of this legislative history is clear. The IMD exclusion was perceived to block the use of Medicaid funds to help pay for the care of the mentally ill under age 65 in a broad range of institutions subsumed under the label "institution for mental diseases," including ICF's. Congress was asked repeatedly to lift this exclusion in whole or in part and refused.
 
 
 26
 Against this record of legislative history, Connecticut offers only a statement prepared by the Senate Finance Committee and offered by Senator Long in support of the December, 1971 legislation transferring ICF coverage to the Medicaid program. The statement declared that "intermediate care coverage is for persons with health-related conditions who require care beyond residential care or boarding home care, and who, in the absence of intermediate care would require placement in a skilled nursing home or mental hospital." 117 Cong.Rec. 44,721 (1971). Connecticut argues from this that Congress intended that Medicaid funding be available for services provided to all patients who otherwise would be in a mental hospital subject to the IMD exclusion. One need not interpret this language so broadly, however. The legislation effecting the transfer made the IMD exclusion applicable to ICF services provided patients under age 65 and was considered by Senator Long to bar Medicaid funding for services provided patients under 65 discharged from mental hospitals and placed en masse in ICF's, as he implicitly acknowledged in the Finance Committee hearings which took place some six weeks after the quoted statement. Given that the Senate Finance Committee statement also speaks of the transfer of ICF coverage from Title XI, federal old age assistance, to the Medicaid program in order to subject ICF's to federal standards and to reduce the placement of patients in skilled nursing facilities who only required less expensive ICF care, id., it is wholly plausible to conclude that the quoted language refers to ICF services available to the elderly and not subject to the IMD exclusion.
 
 
 27
 For the foregoing reasons we are convinced that the IMD definition adopted by HHS and supplemented by its internal criteria reasonably implements Congress' intent. Connecticut's principal complaint is that the IMD definition and criteria adopted by HHS improperly focus on the nature of patients' illnesses rather than the type of care furnished at the facility in question. However, the IMD exclusion virtually compels HHS to focus on the nature of the illnesses treated rather than the care furnished. Except for the use of Medicaid funds to treat the mentally ill under age 65 in general hospitals and patients under age 21 in psychiatric hospitals, Congress has not modified the IMD exclusion to differentiate among types of custodial facilities treating the mentally ill. It is not for us to disturb this decision.
 
 
 28
 Reversed and remanded for entry of judgment consistent with this opinion.
 
 
 
 [1]
 By oversight, the 1971 legislation did not explicitly declare that the IMD exclusion did not prevent the use of Medicaid funds to reimburse states for ICF services provided the elderly in IMDs. A technical amendment was passed in 1972 to clarify this point. Social Security Amendments of 1972, Pub.L. No. 92-603, Sec. 297(a), 86 Stat. 1329, 1459-60 (codified at 42 U.S.C. Sec. 1396d(a)(14)); see S.Rep. No. 1230, 92d Cong., 2d Sess. 320-21 (1972)
 
 
 [2]
 The HHS criteria instruct audit teams to focus on the following characteristics of the institution at issue:
 
 
 [1]
 Licensed as a mental institution
 
 
 [2]
 Advertised as a mental institution
 
 
 [3]
 More than 50% of the patients have a disability in mental functioning
 
 
 [4]
 Used by mental hospitals for alternative care
 
 
 [5]
 Patients who may have entered mental hospitals are accepted directly from the community
 
 
 [6]
 Proximity to State mental institutions (within a 25 mile radius)
 
 
 [7]
 Age distribution uncharacteristic of nursing home patients
 
 
 [8]
 Basis of Medicaid eligibility for patients under 65 is due to mental disability
 
 
 [9]
 Hires staff specialized in the care of the mentally ill
 
 
 [10]
 Independent professional reviews conducted by state teams report a preponderance of mental illness among patients in the facility
 
 
 [3]
 Of the amount disallowed by HHS, $1,137,138 was for services provided patients between the ages of 21 and 65, and $497,517 for services provided patients in other age groups. Under the Medicaid statute, states have the option to choose whether they wish to receive federal financial assistance for services provided patients over age 65 in IMD's. See 42 U.S.C. Sec. 1396a(a)(10), (20), (21). During the period relevant here, Connecticut did not exercise the option. The HHS audit team conceded that had Connecticut done so, federal financial assistance would have been allowed for the services provided Middletown Haven patients age 65 and over
 The statute requires that the Secretary of HHS recover disallowed Medicaid payments by offsetting such payments against future quarterly advances. 42 U.S.C. Sec. 1396b(d)(2). It cannot be determined from the record whether this procedure has been followed in the instant case. Judge Blumenfeld assumed that once his decision was filed, HHS would "promptly restore any setoff already taken." Connecticut v. Schweiker, 557 F.Supp. at 1091. Again, the record is silent on whether HHS has done so. However, the parties have not requested judicial resolution of the matter.
 
 
 [4]
 Illinois sought direct appellate review of a disallowance and its appeal was also dismissed for want of direct appellate jurisdiction. Illinois v. Schweiker, 707 F.2d 273 (7th Cir.1983). The Seventh Circuit held that if judicial review of the disallowance were available, it would lie initially in district court. 707 F.2d at 279
 Minnesota has secured a declaratory judgment holding that HHS acted improperly in disallowing Medicaid payments made for services provided in three ICF's in that state. Minnesota v. Heckler, 718 F.2d 852 (8th Cir.1983). The Eighth Circuit concluded that HHS had acted improperly in focusing on the diagnosis of patients in its decision that the ICFs at issue were also IMDs. 718 F.2d at 866. We disagree with the Eighth Circuit for reasons set forth infra.
 We are informed that California has sought district court review of its IMD-based disallowance, but no decision has been reported.
 
 
 [5]
 Such assistance previously had been available only to the elderly residing in private institutions. H.R.Rep. No. 1300, 81st Cong., 1st Sess., 42 (1949)
 
 
 [6]
 In 1960 Congress modified the IMD exclusion to permit payment for the first six weeks of care in a "medical institution" for the aged who required such care "as a result of a diagnosis of ... psychosis." Social Security Amendments of 1960, Pub.L. No. 86-778, Sec. 601(f)(2), 74 Stat. 924, 991
 
 
 [7]
 Federal funding had been available since 1967 for ICF care provided to the aged, the blind, and the totally and permanently disabled. See supra